**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Garvin Promotion Group LLC and 32X64 LLC, | No. CV-25-03824-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Jackson Jet Center LLC, et al., | |
| Defendants. | |

Before the Court is Plaintiffs Garvin Promotion Group LLC ("GPG") and 32X64 LLC's ("32X64") Motion for Summary Judgment (Doc. 30) against Defendant Jackson Jet Center LLC ("JJC"). The Court **grants in part and denies in part** Plaintiffs' Motion for the reasons below.

## I.    BACKGROUND

This case arises out of damage to an airplane (the "Airplane") owned and operated by Plaintiffs while stored by JJC. The undisputed facts are as follows. (Docs. 31, 33.)

On April 1, 2025, GPG entered into an Aircraft Hangar Storage Agreement with JJC (the "Hangar Lease"). Brian Ready—GPG's director of aviation—was the main point of contact between GPG and JJC regarding the Hangar Lease and the incident with the Airplane at JJC's hangar.

On August 17, 2025, there was wing-to-wing contact with the Airplane and another aircraft, rendering the Airplane unsuitable for service. Brian Swanson—JJC's Operations Manager—called Ready to inform him of the incident, and they discussed how to ensure

GPG's scheduled flight operations. Ready then contacted Bombardier, the Airplane manufacturer, and a technician came out and assessed the damage. Ready and Jeff Jackson—JJC's CEO—discussed GPG's scheduled flights and arrangements for a substitute charter aircraft (the "Interim Lift"). Ready also spoke with Carrie Campbell—JJC's VP of operations—who showed him video footage of the collision.

On August 18, 2025, Ready sent an email to JJC confirming his understanding of the terms of the Interim Lift arrangement (the "Lift Agreement"). Specifically, Ready's email noted that JJC "will provide, and cover the full cost of, [the] interim lift (which may be accomplished by provision of charter aircraft) during the time the airplane is undergoing repair." (Doc. 31-1 at 17.) No one from JJC responded to the email with any corrections, disagreements, or alternate terms. JJC then worked with Ready and arranged and paid for four Interim Lift flights. GPG was not a party to these alternative charter contracts.

On September 5, 2025, Jackson sent an email to GPG demanding reimbursement for the Interim Lift costs. This email was not in response to Ready's August 18 confirmation email.

Consequently, Plaintiffs sued JJC for: negligence; breach of contract; and breach of the covenant of good faith and fair dealing. (Doc. 12.) Additionally, Plaintiffs seek a declaration that JJC is solely liable for the costs and coverage of the Interim Lift. (*Id.* at 7.) JJC counterclaimed. (Doc. 8.) Against GPC only, JJC claims: breach of contract; and breach of the covenant of good faith and fair dealing. (*Id.*) Plaintiffs now move for summary judgment as to all claims brought against and by JJC. (Doc. 30.)

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of a case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion by . . . citing to particular parts of materials in the record" or by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. Additionally, the Court does not make credibility determinations or weigh the evidence. *Id.* "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.*

The burden initially falls on the movant to demonstrate the basis for a motion for summary judgment and "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has the burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.   DISCUSSION

The Court begins with Plaintiffs' breach of contract claim.

- 3 -

**A. Breach of Contract**

"A breach of contract claim requires proof that the contract existed, the defendant breached it, and the plaintiff suffered damages." *Mahanti v. Fraser*, No. 1 CA-CV 25-0069, 2025 WL 3473055, at *2 (Ariz. Ct. App. Dec. 3, 2025). "For an enforceable contract to exist, there must be an offer, acceptance, consideration, a sufficiently specific statement of the parties' obligations, and mutual assent." *Buckholtz v. Buckholtz*, 435 P.3d 1032, 1035 (Ariz. Ct. App. 2019) (citation modified). Plaintiffs' Motion argues Defendants breached two contracts: (1) the Lift Agreement; and (2) the Hangar Lease. However, Plaintiffs' Second Amended Complaint ("SAC") does not plausibly plead breach of the Hangar Lease. Plaintiffs' SAC conclusory states: "Defendant's actions described above constitute . . . an anticipatory breach of the Hangar Lease" without explaining how.[1] (Doc. 12 at 8.) Consequently, the Court cannot grant summary judgment for any claim predicated on Defendant breaching the Hangar Lease because Plaintiffs fail to plausibly plead this claim. *See Willis v. Aron*, No. 4:23-CV-00732-ALM-BD, 2024 WL 5319602, at *4 (E.D. Tex. Nov. 19, 2024) ("[A] case may proceed to the summary-judgment stage only if the plaintiff states a plausible claim."). Therefore, the Court only considers Plaintiffs' claim for breach of the Lift Agreement.

Plaintiffs must prove there is no genuine dispute that the Lift Agreement is enforceable. Plaintiffs' SAC alleges GPG and JJC orally agreed that JJC would cover the full cost of the Interim Lifts. (Doc. 12 at 3.) The only evidence of this agreement is the email from Ready confirming the terms of their conversation. (Doc. 31-1 at 17.) The email states in relevant part:

> This email communication is to confirm the agreement between Garvin Promotion Group LLC (the operator), 32X64 LLC (the owner) and Jackson Jet Center regarding the winglet damage to our Global 5500. In view of the

---

[1] Although Plaintiffs' Motion explains that JJC's refusal to pay for the damage to the Airplane preemptively breached the Hangar Lease, this does not cure the SAC's deficiencies. *See Gilmore v. Lockard*, No. 1:12-CV-00925-LJO-SAB (PC), 2016 WL 4160635, at *4 (E.D. Cal. Aug. 4, 2016) ("At the summary judgment stage, a plaintiff may not amend a complaint through argument in a motion for summary judgment."). Even so, the SAC also never alleges that JJC promised, in communications or in the Hangar Lease, to pay for the damage to the Airplane.

damage caused to the airplane by Jackson, Jackson has agreed to provide for the full cost for replacement of the damaged winglet—inclusive of the new part/kit replacement, painting, and relocation fuel—the work to be completed by BAS Tucson. In addition, Jackson will provide, and cover the full cost of, interim lift (which may be accomplished by provision of charter aircraft) during the time the airplane is undergoing repair specifically for the following:

. . . .

Please acknowledge receipt of this email, and agreement with the terms set out, by reply to all.

Sincerely,
Brian

(*Id.*)  It is undisputed that no one from JJC responded to the email with any corrections, disagreements, or alternate terms.  (Doc. 33 at 3.)  JJC disputes, however, that its failure to deny the August 18 email, and subsequent coordination and payment of the Interim Lifts, constituted an acceptance of Plaintiffs' terms.  (*Id.*)  JJC's Statement of Facts includes an affidavit from Jeff Jackson—who spoke with Ready regarding the Interim Lift arrangements—declaring that "JJC's understanding at all times was that GPG would reimburse JJC for those expenses."  (Doc. 33-1 at 3.)  As further evidence of this intent, JJC includes the Hangar Lease between GPG and JJC, which excludes liability for costs associated with substitute aircrafts:

LIMITATION OF LIABILITY. THE PARTIES HEREBY AGREE THAT UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR . . . THE COST ASSOCIATED WITH SUBSTITUTE OR REPLACEMENT AIRCRAFT.

(*Id.* at 12.)

The Court finds there is genuine doubt that JJC accepted and mutually assented to GPG's terms.  "An acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer."  *Ariz. Custom Contracting, Inc. v. Green*, No. 2 CA-CV 2019-0108, 2020 WL 2787583, at *3 (Ariz. Ct. App. May 29, 2020) (citation modfified) (citing Restatement (Second) of Contracts § 50 (A.L.I. 1979)).  Here, Ready invited JJC to accept the terms of the August 18 email "by reply to all."  (Doc. 31-1 at 17.)  But JJC never emailed back accepting the terms.  JJC

forwarded the email to its insurer, CC'ing Ready, stating: "We need your review and approval. Please call with any questions." (Doc. 33-1 at 28.) Ready responded to the CC email stating: "Email well received. Have a great evening." (*Id.* at 32.) Then, on September 5, JJC emailed Ready demanding reimbursement. (*Id.* at 36.) Viewing these exchanges in the light most favorable to JJC, they do not demonstrate an unequivocal acceptance. *Clark v. Compania Ganadera de Cananea, S. A.*, 385 P.2d 691, 697 (Ariz. 1963) ("In order to create a contract, the acceptance of the offer must be unequivocal.") The Court, however, recognizes that "[a]cceptance of an offer may be implied from acts or conduct," *In re Mariotte's Est.*, 619 P.2d 1068, 1069 (Ariz. Ct. App. 1980), and JJC acted in accordance with the terms of the August 18 email by arranging and fronting the cost of the Interim Lifts. But given Jeff Jackson's declaration, the email exchanges, and the language of the Hangar Lease, the Court finds there is a genuine dispute of material fact as to whether the Lift Agreement is an enforceable contract.

Accordingly, the Court denies Plaintiffs' Motion as to their breach of contract claim. Consequently, the Court also denies Plaintiff's Motion as to their breach of the covenant of good faith and fair dealing claim and request for declaratory relief because both depend on the Lift Agreement being enforceable as a matter of law.

**B. Negligence**

Plaintiffs allege JJC negligently damaged the Airplane.[2] (Doc. 12 at 7–8.) "To recover on a negligence claim, a plaintiff must prove a duty requiring the defendant to conform to a standard of care, breach of that duty, a causal connection between breach and

---

[2] Defendants argue Plaintiff's negligence claim is barred by the economic loss doctrine. However, the Court shares the hesitancy expressed by other courts in this district to apply the economic loss doctrine to bar a negligence claim because "[t]he Arizona Supreme Court has only ever applied the doctrine in two contexts: construction defects and strict products liability." *See, e.g., Indus. Park Ctr. LLC v. Star Fisheries Inc.*, No. CV-22-01657-PHX-SRB, 2024 WL 6836533, at *9 (D. Ariz. Aug. 1, 2024); *CSAA Affinity Ins. Co. v. AmeriGas Propane LP*, No. CV-21-08041-PCT-MTM, 2023 WL 2691450, at *2–3 (D. Ariz. Mar. 29, 2023). Given the Arizona Supreme Court's signal that "Arizona takes a narrower approach" to this doctrine, the Court will not apply it outside these two express scenarios. *Sullivan v. Pulte Home Corp.*, 306 P.3d 1, 2 (Ariz. 2013); *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010) (explaining that its application of the economic loss doctrine in construction defect cases "does not suggest that the doctrine should be applied with a broad brush in other circumstances").

injury, and resulting damages." *Ryan v. Napier*, 425 P.3d 230, 235 (Ariz. 2018). Plaintiffs provide sufficient evidence as to each of these elements.

JJC owed Plaintiffs a duty of reasonable care. "Duties are based either on special relationships recognized by the common law or on relationships shaped by public policy." *Perez v. Circle K Convenience Stores, Inc.*, 564 P.3d 623, 627 (Ariz. 2025). A bailor and bailee is a special relationship wherein the common law imposes specific duties "regardless of whether there is a contract, express or implied, and generally regardless of what its covenants may be." *Barmat v. John & Jane Doe Partners A-D*, 747 P.2d 1218, 1221 (Ariz. 1987). "A bailment arises where personal property is delivered to one party by another in trust for a specific purpose, with the express or implied agreement that the property will be returned or accounted for when the purpose is accomplished." *Kim v. Wong*, 512 P.3d 689, 690 (Ariz. Ct. App. 2022) (citation modified). Thus, "a bailee owes a duty to exercise reasonable care to prevent damage to or loss of the bailed property." *Id.*

JJC and GPG entered a bailment when JJC agreed to store the Airplane. The Hangar Lease evidences this special relationship. (Doc. 31-1 at 7.) Therefore, JJC had a duty to use reasonable care to prevent damage to the Airplane. *See Alitalia v. Arrow Trucking Co.*, 977 F. Supp. 973, 980 (D. Ariz. 1997) ("Arizona recognizes that a bailor can sue a bailee for damages to bailed property under a theory of negligence.").

There is sufficient evidence that JJC breached its duty.[3] Plaintiffs submit an affidavit from Ready declaring that JJC's Operations Manager called him on August 17 at 3:00pm, informing him of the damage to the Airplane:

> I received a call from Brian Swanson, Operations Manager for JJC, advising me that there had been wing-to-wing contact with our Airplane. Mr. Swanson related that the Jackson line crew was moving another business jet aircraft, a Preator 500 (N895CA), and pushed the left-hand wing of the Preator into our left-hand wing.

---

[3] Plaintiffs argue *res ipsa loquitur* for the first time in its Reply brief. (Doc. 34 at 8.) Whether *res ipsa loquitur* should apply, however, is a question of law. *Ward v. Mount Calvary Lutheran Church*, 873 P.2d 688, 692 (Ariz. Ct. App. 1994). "In the Ninth Circuit, 'the general rule is that a party cannot raise a new issue for the first time in its reply brief.'" *Shakopee Mdewakanton Sioux Cmty. v. FBCV, LLC*, No. 2:10-CV-10 JCM RJJ, 2011 WL 4708063, at *1 (D. Nev. Oct. 4, 2011) (citation modified) (quoting *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)). Thus, the Court cannot consider it here.

(Doc. 31-1 at 2.)   JJC confirms this in part: "Undisputed that wing-to-wing contact occurred on August 17, 2025, and that repairs were necessary before the aircraft returned to service."  (Doc. 33 at 2.)  This affidavit is sufficient to establish that JJC's personnel unreasonably pushed another aircraft into the Airplane.  *See* Fed. R. Civ. P. 56(c)(4); *Venti v. Xerox Corp.*, No. 1:21-CV-00131-DKG, 2023 WL 3851777, at \*4 (D. Idaho June 6, 2023) ("An affidavit is an acceptable form in which to present evidence in the summary judgment context.").  Although JJC disputes that its personnel were at fault, it provides no evidence to prove otherwise.  Therefore, there is no genuine dispute that JJC breached its duty to use reasonable care to prevent damage to the Airplane.

Finally, there is sufficient evidence that JJC's breach caused damage to the Airplane's left winglet.  Ready declares that he arrived at JJC's hangar on August 17, took photos of the Airplane, and confirmed the damage to the left-hand wingtip of the Airplane.  (Doc. 31-1 at 2.)   JJC does not dispute that repairs were necessary because of the wing-to-wing contact.  (Doc. 33 at 2.)  Additionally, Plaintiffs include two maintenance invoices from Bombardier detailing the $673,635.17 in repairs necessary to repair the left winglet and return the Airplane to service.  (Doc. 31-1 at 25–38.)  In particular, these invoices state: "LH WINGLET DAMAGED.  REPAIR/REPLACE AS REQUIRED." (*Id.* at 28.)  Therefore, there is sufficient evidence to establish that JJC's breach caused damage to the Airplane's left winglet.  Again, although JJC disputes that the contact caused all these damages claimed, it fails to provide any contrary evidence.  Therefore, there is no genuine dispute that JJC's breach caused $673,635.17 in damage to the Airplane.

Based on the foregoing, there is no genuine dispute that JJC acted negligently.  Therefore, the Court grants Plaintiffs summary judgment as to their negligence claim against JJC.

…

…

…

## IV.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting in part and denying in part** Plaintiffs' Motion for Summary Judgment (Doc. 30).

Dated this 1st day of July, 2026.

Honorable Susan M. Brnovich
United States District Judge